

IN THE HEALTH CARE ALTERNATIVE DISPUTE
RESOLUTION OFFICE OF MARYLAND

BONNIE FORTNER              *

   *Claimant*             *

v.                          *     HCA No. _____

Kaiser Foundation Health Plan   *
of the Mid-Atlantic States, Inc., *et al*:
                             *

   *Defendant Health Care Provider*
                             *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CERTIFICATE OF QUALIFIED EXPERT

I, Bruce D. Charash, M.D., hereby certify that the following statements are true and accurate:

1. I, Bruce D. Charash, M.D., am a board-certified internal medicine physician licensed to practice medicine in the State of New York.

2. In addition to being board-certified in internal medicine, I have clinical experience, have provided consultation relating to clinical practice, and/or taught medicine in the Defendant Healthcare Providers' specialty and/or sub-specialties of medicine, or the specialty and/or sub-specialties of medicine practiced by the Defendant Healthcare Providers and/or their agents, servants, and/or employees, or a related field of health care, within five (5) years of the date of the alleged act or omission giving rise to the underlying cause of action.

3. From my review of the pertinent medical records, I have concluded with reasonable medical probability that there were deviations from the accepted and applicable standards of care on the part of the Defendant Healthcare Providers Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and Mid-Atlantic Permanente Medical Group, P.C., acting

through their agents, servants, and/or employees Maia Patel, M.D., Dana Sloane, M.D., Mark Walker, M.D., and Michele Henley, M.D.

4. I have also concluded with reasonable medical probability that these deviations were a direct and proximate cause of the Claimant's alleged injuries and damages.

5. Attached is a brief statement of my opinions in this matter.

6. Less than twenty percent (20%) annually of my professional activities involves testimony in personal injury cases.

Bruce D. Charash, M.D.

Bruce D. Charash, M.D.
210 Central Park South, #2A
New York, New York 10019

Christopher S. Norman
Wais, Vogelstein & Forman, LLC
1829 Reisterstown Road, Suite 425
Baltimore, Maryland 21208



RE:   **Bonnie Fortner**

Dear Mr. Norman:

    I have reviewed Bonnie Fortner's records from Kaiser Permanente, St. Agnes Hospital, and the University of Maryland Medical Center. Based on my review of the medical records, it is my opinion that Kaiser physicians Main Patel, M.D., Dana Sloane, M.D., Mark Walker, M.D., and Michele Henley, M.D., deviated from the applicable standards of care during their care and treatment of Bonnie Fortner. It is also my opinion to a reasonable degree of medical certainty that their deviations were a direct and proximate cause of Bonnie Fortner's injuries and damages.

    Mrs. Fortner was seen by Dr. Patel on June 30, 2011 for follow up from a recent hospitalization. During this visit, Dr. Patel ordered various laboratory studies, which were drawn on this date and showed, among other things, an AST of 100, an ALT of 73, and an ALKP of 150.

    On July, 1, 2011, Mrs. Fortner was seen by Dr. Mark Walker for, among other things, hypocalcemia. He noted that Mrs. Fortner has also recently experienced muscle spasm and weakness, low potassium, calcium, and magnesium, indigestion and reflux, and loose bowels.

    On July 7, 2011, Dr. Patel noted that she was referring Mrs. Fortner to a gastroenterologist. Dr. Patel also noted that she "ordered a broad workup per LFT abnormality guidelines"; and that she ordered repeat laboratory work in light of Mrs. Fortner's previously elevated liver enzymes. The labs completed on this date showed an AST of 139, an ALT of 81, and an ALKP of 162. Additional laboratory work done on this date was negative for Hepatitis A, B, and C. She was also found to have high iron and FE/TIBC. Additional lab work done on August 4, 2011 apparently showed an AST of 64 and an ALT of 60.

    Mrs. Fortner saw Dr. Sloane on August 8, 2011 for an evaluation of her abnormal liver associated tests, diarrhea, and GERD. Dr. Sloane noted that a review of potential risk factors revealed the Mrs. Fortner had a blood transfusion in 2001, and that she has multiple tattoos. Dr. Sloane also noted that Mrs. Fortner had no history of IV drug use, excessive alcohol or other illicit drug use, hepatotoxic or herbal medication use, history of previous hepatitis or jaundice, family history of liver disease, or extensive travel outside of the United States. Mrs. Fortner reported unintentional weight loss. The note indicates that Mrs. Fortner's liver was palpable 4 cm below the right coastal margin. Dr. Sloane's "impression" note from this visit is devoid of

any comment regarding Mrs. Fortner's abnormal liver tests. Dr. Sloane's recommendations included, among other things, a right upper quadrant ultrasound, a complete serologic evaluation including hepatitis, and follow up in 6 weeks. The note also indicates that Dr. Sloane advised the patient to refrain from all alcohol, tobacco, and drug use.

Additional laboratory work was returned on August 9, 2011. The results were negative for hepatitis B and C, but positive for hepatitis A. Ferritin was high. The results also showed normal IGG, IGA, IGM, ACTIN IGG, MITOCHONDRIA AB, and Alpha 1 fetoprotein.

Dr. Walker sent Mrs. Fortner a message on August 16, 2011. This message indicates that Dr. Walker was aware of Mrs. Fortner's recent visit with Dr. Sloane. The message also states that "most of the labs you did for me was [sic] fine, but the carotene was low, suggesting you are not absorbing nutrients in your gut." This message chain also indicates that Dr. Walker was aware of the labs that Mrs. Fortner did recently for Dr. Patel, and suggests doing additional labs for Dr. Walker in 2-3 weeks.

Mrs. Fortner sent Dr. Sloane a message on August 24, 2011 to let her know that she had to cancel her appointment for September 21st and that she needed to cancel her upcoming ultrasound in light of her work schedule. Mrs. Fortner stated that she wanted to reschedule her ultrasound for September 29, and her appointment for October 21. Dr. Sloane responded that Mrs. Fortner's request to reschedule was no problem, and that she should contact radiology directly to reschedule.

The next follow up from any Kaiser medical provider did not occur until Mrs. Fortner sent Dr. Sloane a message on March 11, 2012 asking for a refill of her Protonix, a medication used to treat GERD. Dr. Sloane responded to Mrs. Fortner's request and provided a refill for the Protonix, but did not inquire regarding the ultrasound and follow up appointment that she requested for Mrs. Fortner back in August of 2011. Dr. Sloane did not see Mrs. Fortner at this time.

The next contact Mrs. Fortner had with Dr. Patel did not occur until June 5, 2012, when Mrs. Fortner reached out to Dr. Patel and asked for follow up labs. Dr. Patel responded by ordering labs for Mrs. Fortner, and also letting her know that she moved her office to White Marsh, and that Dr. [Michele] Henley was now listed as Mrs. Fortner's doctor at the Severna Park location. The lab work that Mrs. Fortner requested was returned on June 14, 2012 – it showed an AST of 62, an ALT of 37, and normal ALKP and bilirubin.

Mrs. Fortner saw Dr. Michele Henley for the first time on June 27, 2012 for a health assessment. Although Dr. Henley's note indicates that Mrs. Fortner had a history of abnormal liver function tests, her assessment and plan did not address that historical finding.

On January 4, 2013, Mrs. Fortner was again seen by Dr. Henley. Mrs. Fortner was reporting pain, nausea, vomiting, and diarrhea, and a feeling as though she was having a recurrence of shingles. Mrs. Fortner was noted to be mildly dehydrated. Again, Dr. Henley's assessment and plan did not address Mrs. Fortner's liver function abnormalities.

Mrs. Fortner sent a message to Dr. Henley on January 6, 2013, telling her that she was still feeling very sore and weak. Mrs. Fortner explained that she was unable to go to work, and requested a work note. Mrs. Fortner sent a similar message again on January 10, 2013.

Mrs. Fortner saw Dr. Sloane on January 16, 2013, for the first time in 17 months since her initial appointment back in August of 2011. Dr. Sloane noted that Mrs. Fortner was previously seen on August 8, 2011 for evaluation of abnormal liver associated tests. Dr. Fortner's "impression" note reads "history of abnormal liver associated tests, no follow up since 2011." Dr. Sloane noted that Mrs. Fortner had been experiencing persistent nausea, vomiting, and diarrhea for the last two weeks. Lab results from this date include an AST of 177, an ALT of 132, an ALKP of 124, and normal bilirubin. Dr. Sloane's recommendations were: counseled on gentle perianal care, obtain stool studies, pending result consider empiric treatment for small intestine bacterial overgrowth, counseled on lactose avoidance, check iron indices – hereditary hemachromatosis, contact with questions or concerns, follow up after stool studies. Again, no mention was made of a plan for determining the cause of Mrs. Fortner's liver function abnormalities.

On February 21, 2013, Mrs. Fortner was seen by Dr. Michele Henley for follow up from a recent hospitalization for hand cramps. Dr. Henley's note includes lab results from the recent hospitalization, including an AST of 112, an ALT of 82, an ALKP of 127, and normal bilirubin. Again, Dr. Henley's assessment and plan did not address Mrs. Fortner's liver function abnormalities.

Mrs. Fortner saw Dr. Walker again on February 27, 2013 for routine follow up of her hypocalcemia. Dr. Walker noted that Mrs. Fortner's energy was poor. Her bowels were still loose liquid, and contained undigested food. He noted that she had been to the ER recently for muscle spasm, facial numbness, tingling and difficulty breathing. He also noted a mild tremor in her hands.

Dr. Sloane sent Mrs. Fortner a message on March 21, 2013, telling Mrs. Fortner that her concern at this point was either a neuroendocrine process causing the diarrhea, or an underlying small bowel Crohn's disease.

On June, 3, 3013, Mrs. Fortner saw a new primary care physician, Dr. Akoto, for the first time. According to Dr. Akoto, Mrs. Fortner's diagnoses at the time included fatigue, hypocalcemia, hypomagnesemia, hypokalemia, impaired fasting glucose, abnormal finding on liver function, rash, and chronic bronchitis. Dr. Akoto noted that Mrs. Fortner was suffering from chronic fatigue, myalgias, anhedonia, poor appetite, and recent agoraphobia. The note indicates that she has not been able to work due to her symptoms. The note also states that Mrs. Fortner was found to have multiple electrolyte and vitamin abnormalities and has been seeing endocrinology for that. Her mood was worse. The note states that Mrs. Fortner wanted screening for her chronic complaints.

Labs were drawn on June 4, 2013. The results included, among other things, an AST of 246, an ALT of 101, an ALKP of 200, high bilirubin, and a low BUN. Dr. Akoto sent Mrs. Fortner as message on this date stating: "Your liver function is considerably worse and the worse

[sic] that it has ever been. I want you to follow up with Dr. Sloane as soon as possible for evaluation. Did you ever get a liver biopsy? Do you drink any alcohol or take any over the counter supplements or herbs? Your vitamin D level was also low. I would like you to supplement this with vitamin D." Mrs. Fortner responded: "I drink about 6 glasses of wine a day, this helps me with my depression and ability to sleep. No I have never had my liver biopsied. Dr. Sloane has mentioned that my liver function had high levels, but never mentioned getting a biopsy."

Dr. Akoto sent Mrs. Fortner another message on June 5 stating: "You need to stop drinking. Your liver function is much worse than before. Your liver can't tolerate the amount of alcohol at this point. You are starting to get higher levels of bilirubin in your bloodstream …your hepatitis tests were normal so the drinking is probably the major cause of the liver damage. The liver can regenerate itself but not if you keep drinking … I would recommend stopping and letting us recheck the enzymes in 1 month …"

On June 18, 2013, Dr. Sloane sent Mrs. Fortner a message saying that the results of her labs were possibly consistent with a neuroendocrine problem as the cause of her diarrhea. Dr. Sloane suggested an octreotide scan at Hopkins to look for any anatomic cause of a hormone problem.

The octreotide scan was done on July 31, 2013. The scan evidenced hepatomegaly, profound fatty liver, pericholecystic fluid collection, gallbladder wall thickening, and mesenteric fatty stranding in the right lower quadrant. Dr. Sloane sent Mrs. Fortner a message on August 5, 2013 regarding the results of the octreotide scan. Dr. Sloane did not notify Mrs. Fortner in this message of the diagnosis of fatty liver, but instead just told Mrs. Fortner that the octreotide scan did not show any evidence of a neuroendocrine tumor.

On August 15, 2013 Mrs. Fortner was seen by Dr. Akoto. This note indicates that the octreotide scan evidenced fatty liver and a fluid collection. Lab results from this visit include a low BUN, low eGFR, low albumin, normal ALT, AST of 82, ALKP of 159, and high bilirubin.

Mrs. Fortner was admitted to St. Agnes Hospital on August 17, 2013. The records from this admission indicate that Mrs. Fortner was sent to the hospital by her primary care physician after having multiple bouts of nausea, vomiting, and diarrhea, with complete p.o. intolerance and abdominal pain. She had a 38lb weight loss in the last two months. Imaging studies during this admission showed fatty infiltration of the liver which was enlarged with ill-defined areas of hypoattenuation. Labs during this admission include the follow results, among others: BUN 5, Creatinine 1.2, eGFR 48, total bilirubin 2, direct bilirubin 1.2, indirect bilirubin .8, AST 60, ALT 19, albumin 2.7, and lipase 10. On physical exam she was noted to be mildly jaundiced. A gastroenterology consult during this admission noted, among other things, that Mrs. Fortner's liver was massively enlarged, hard, and slightly irregular. At the time of the gastroenterology consult an MRI was pending – it was noted that if the MRI was not helpful, a liver biopsy would be needed. Mrs. Fortner was transfer from St. Agnes to the University of Maryland on September 6, 2013. Her diagnoses at the time of discharge included, among other things, hepatic steatosis and cirrhosis.

While at the University of Maryland, there is a note in the Kaiser records stating "prior evaluation from 1/2013 demonstrated fluctuating liver associated tests. Liver biopsy was discussed, but deferred for evaluation/management of diarrhea." The healthcare providers at the University of Maryland determined that Mrs. Fortner required a liver and kidney transplant. According to the records, Kaiser refused to cover Mrs. Fortner's transplant for a number of varying reasons, including because in their opinion, the transplant was "not medically necessary." The records indicate that Mrs. Fortner stopped drinking in June of 2013, presumably as a result of Dr. Akoto's message informing her of her abnormal liver function tests, inquiring about her alcohol use, informing her of the affect of alcohol on her liver, and telling her that she needed to stop drinking. Ultimately, Mrs. Fortner received a liver and kidney transplant at the University of Maryland and was discharged in early 2014.

I offer the following opinions regarding the care and treatment rendered to Mrs. Fortner by the aforementioned healthcare providers, based upon my review of the records, my education, training, and experience as an internal medicine physician, and based upon my understanding of the standard of care:

First, the standards of care required the healthcare providers to thoroughly review Mrs. Fortner's medical history, including her historical laboratory results, and to be aware of Mrs. Fortner's abnormal liver function tests.

Second, the standards of care required the healthcare providers to promptly inform Mrs. Fortner of her abnormal liver function values, which were first noted on June 30, 2011. In this regard, a physician with the base of knowledge that would be required to practice within the standard of care should have immediately suspected alcohol as the cause of Mrs. Fortner's liver function abnormalities in light of the fact that the AST was higher than the ALT, which generally does not occur in non-alcoholic liver disease.

Third, in light of the blood tests results which ruled out other causes of Mrs. Fortner's liver function abnormalities such as hepatitis, the standard of care required the healthcare providers to order imaging studies in an attempt to definitively diagnose the cause of Mrs. Fortner's abnormal liver function tests, and ensure that those imaging studies were completed in a timely manner.

Fourth, if the imaging studies were not diagnostic, the standards of care required the healthcare providers to question Mrs. Fortner directly regarding her alcohol usage, over and beyond the general questioning done when taking a typical social history.

Fifth, if Mrs. Fortner admitted to alcohol use, the standard of care required the healthcare providers to counsel Mrs. Fortner regarding the affect of alcohol on her liver, and aid Mrs. Fortner in getting help for her alcohol use if necessary.

Sixth, if Mrs. Fortner denied alcohol use, the standard of care required the healthcare providers to send Mrs. Fortner for a liver biopsy, which more likely than not would have resulted in a diagnosis of cirrhosis, at which time the standard of care would have required the healthcare providers to counsel Mrs. Fortner regarding the affect of alcohol on her liver, and aid Mrs.

Fortner in getting help for her alcohol use if necessary.

Seventh, throughout the workup for Mrs. Fortner's abnormal liver function tests that was required by the standards of care, the standards of care required the healthcare providers to ensure that Mrs. Fortner was seen in follow up on a regular basis until the cause of her abnormal liver function tests was determined.

Eighth, throughout the workup for Mrs. Fortner's abnormal liver function tests that was required by the standards of care, the standards of care required the healthcare providers to consult, coordinate, and confer with Mrs. Fortner's other treating healthcare providers to ensure that the cause of Mrs. Fortner's abnormal liver function tests was being worked up appropriately.

The healthcare providers breached the standards of care by failing to do all of the aforementioned things that were required by the standards of care.

Had the healthcare providers complied with the standards of care as set forth above, it is my opinion to a reasonable degree of medical probability that the cause of Mrs. Fortner's abnormal liver test results would have been diagnosed at an earlier time, that Mrs. Fortner would have received any care and treatment that she may have needed in order to stop drinking, and that she would have avoided permanent damage to her liver and kidneys. Stated otherwise, it is my opinion to a reasonable degree of medical probability that as a direct and proximate result of the aforementioned breaches in the standards of care by the aforementioned healthcare providers, Mrs. Fortner sustained injuries and damages, including liver and kidney failure.

This report is not, nor is it intended to be, an exhaustive description of all my opinions, conclusions and/or their basis. My opinions, stated above, are given with a reasonable degree of medical probability and/or certainty and may be modified and/or supplemented upon review of additional information and/or documents.

Sincerely,

Bruce D. Charash, M.D.